OPINION OF THE COURT
Carolyn E. Demarest, J.
Defendant James Barrows was convicted following a lengthy jury trial of one count of promoting an obscene sexual performance by a child in violation of Penal Law § 263.10 and two counts of attempted disseminating indecent material to minors in the first degree in violation of Penal Law §§ 110.00 and 235.22. Defendant has moved, pursuant to CPL 330.30 (1), to set aside the verdict asserting that the statutes at issue are unconstitutional and violate the First Amendment and the Commerce Clause (US Const, art I, § 8, cl [3]) of the United States Constitution and that an appellate court would therefore *714 be required to reverse as a matter of law. Defendant relies specifically upon the recent decision of the United States Supreme Court in Reno v American Civ. Liberties Union (521 US 844, 117 S Ct 2329 [1997] [hereafter Reno]), and the decision from the Southern District of New York in American Libs. Assn. v Pataki (969 F Supp 160 [SD NY 1997]). The arguments raised upon this motion were previously considered in the context of an omnibus motion early in the litigation by my colleague Justice Alan Marrus who denied the motion to dismiss upon the constitutional challenge. (People v Barrows, 174 Misc 2d 367 [Sup Ct, Kings County 1997].) Based upon the voluminous evidence adduced at trial before this court, however, it is necessary to reconsider this argument.[1]
FACTS OF THE CASE
This case involves the use of the Internet as a means by which defendant James Barrows, operating from his personal computer in Madison, Connecticut, solicited an individual represented to be a 13-year-old female in Brooklyn for sexual purposes. The prosecution arose out of a “sting” operation initiated by the District Attorney of Kings County and the New York City Police Department to locate and apprehend purveyors of child pornography through the Internet.
In May of 1996, Deputy Inspector Robert Hayes, the Commanding Officer of the Detective Bureau assigned to the Kings County District Attorney’s Office on Joralemon Street in Brooklyn, initiated an investigation into the use of the Internet by pedophiles as a means to gain access to child pornography and to vulnerable children themselves for the purpose of engaging them in pornographic communication and actual sexual activities. Using a fictitious identity as “Tori 83”, a 13-year-old female named Victoria, born November 24, 1982, Inspector Hayes opened an account with America Online, a provider of access to the Internet, as well as computer products of its own design. Through America Online, Inspector Hayes was able to access “cyberspace” and enter “chat rooms” for “real time” “conversations” with people all over the world. In addition to these “chats”, in which up to 23 people are able to communicate simultaneously through typed messages which appear on a *715 common screen visible to all participants, the participants are also able to send private “instant messages” to each other which are not visible to all, and may also send e-mail to any individual whose “address” on the Internet is known.[2] Also available are private “chat rooms” which are established by individual users who may invite others to enter but which may not be otherwise accessed.[3]
Inspector Hayes began his investigation by entering the America Online “Pre-Teen Room” which provided a forum for “picture trading”. It is unclear whether the participants are meant to be preadolescents or whether the photographs are meant to depict preadolescents or both. (The Pre-Teen Room has since been deleted from the services currently available through America Online.) In his search for child pornography, Inspector Hayes would “log-on” during hours when children would be likely to use the computer: after 3:30 p.m. on weekdays and on weekends. As 13-year-old Tori, he received instant messages from hundreds of adult males from all over the country and the world. Enlisting the assistance of America Online to access subscriber information, he was able to obtain the geographical locations for the participants whose screen identities could well, like his own, be completely fictitious. By obtaining telephone numbers, usually from the computer user himself, prearranged calls were placed by female Detective Karen Gumbs to verify that the computer personality was actually an adult male. Detective Gumbs spoke with men in Washington, Oregon, Texas and New Jersey, as well as defendant in Connecticut. The telephone conversations were sexually explicit and, much like the cyberchats in evidence, included offers to “teach” the purported adolescent concerning sexual activities and to meet with the teen female for such purpose.
Defendant James Barrows first contacted Tori 83 on August 21, 1996, in the “Pre-Teen Room” using the “screen name” “Captain Jake”. Captain Jake sent Tori an instant message as follows:
*716 “captain jake: Hi from CT, MWM 39, you?
“tori 83: Xcool, I’m much younger, but I don’t care.
“captain jake: I like older girls. Do you like older men?
“tori 83: Does MWM mean married?
“captain jake: Yes, it does.
“captain jake: Married White male.
“captain jake: What do you look like?
“captain jake: Victoria, what a nice name.
“tori 83: I like older men because they know more.
“tori 83: I like Tori better.
“captain jake: I know a lot and I am not just cyber. I like to meet. To it’s ot meet. [Sic.]
“captain jake: What do you like to do, or are you a virgin?
“captain jake: Okay, Tori it is.
“tori 83: That’s cool. I only met one guy from the computer before. It was really fun he was 26.
“captain jake: What did you do with him?
“tori 83: Do you like younger girls?
“captain jake: Yes, I do.
“captain jake: Are you a cop?
“tori 83: Cool, we met on a friend boat. We had about five hours together. He was from NJ.
“tori 83: I’m going to be 14 in November. You got to be kidding.
“captain jake: No, I am not kidding. There are a number of cops online that want to arrest people who like younger girls.
“I have to go. I would love to get an e-mail from you and we can make plans.
“captain jake: Okay?
“captain jake: Sorry, have to go. Can’t wait, send e-mail. I am real. We can have fun together.
“captain jake: Please respond.” (People’s exhibit 3.)
Tori did not respond because, as Inspector Hayes explained, he did not want to arouse defendant’s suspicions that he was “a cop” by appearing too eager.
The next contact with defendant occurred on October 14, 1996, when Tori again received an instant message from Captain Jake while in the America Online Pre-Teen Room inviting her to “play” in a private chatroom, “XX Jake.” The private “chat” continued for several pages, included very *717 graphic descriptions of various sex acts and culminated in defendant providing his telephone number upon Tori’s offer to telephone using a calling card. The conversation included Captain Jake’s descriptions of prior sexual activities with his 13-year-old stepsister and a discussion of Tori’s age, physical development and attendance in the eighth grade. Captain Jake declared, “I want to do you”, but cautioned, “I can go to jail for having sex with a minor” (exhibit 6).
On October 14, acting as Tori 83’s voice, Detective Gumbs placed a telephone call to the number supplied by Captain Jake. The telephone was answered by a male who identified himself as Captain Jake.[4] Both Inspector Hayes and Detective Gumbs testified to the contents of the conversation during which Captain Jake said he was masturbating and gave Tori explicit instructions to do the same. Following Tori’s confirmation that she was 13 years old, Captain Jake said he wanted to meet her to engage in sex. Telephone records for the number called identified the subscriber as defendant James Barrows of 75 Fawn Brook Circle, Madison, Connecticut. At 6:43 p.m., approximately four hours after the telephone conversation, Tori received e-mail from Captain Jake thanking her for the call and reiterating his desire to meet her for “real”, as opposed to phone, sex indicating, “Of course, after we meet, I will want to do a lot more than chat, but we must start with a meeting to find out what will happen” (exhibit 7). This communication also included very graphic details of just what he expected “to do” and closed, “Erotically yours, Captain Jake.” The telephone call of October 14 was the only live contact between “Tori” and defendant prior to their meeting on December 23, 1996.
People’s exhibit 35 is Captain Jake’s “profile” printed out on December 13, 1996, as follows:
“Member number Jake. Dominant MWM. 5’ 10”, 175 pounds, seven and-a-half inches, dark blond, blue, location New Haven County, Connecticut USA.
“Travel all of North East, Birthdate: 2/17, 39 plus. Sex: Male. Marital status: Married. Computers PC. Hobbies: AOL, sailing, wine, realtime. Erotic. Creative. Sensuous sex. D/S, B/D.[5]
“Occupation: Management consultant. Spend nights in motels, come and visit.
*718 “Personal quote: Only sailors get blown off shore. I am a sail- or.”
Inspector Hayes did not receive defendant’s e-mail of October 14 until October 21, whereupon he sent a reply encouraging the requested meeting. A copy of this e-mail was found in defendant’s own computer files subsequently seized by police. Captain Jake sent the next e-mail on October 23, 1996, again referencing the telephone conversation. Several additional exchanges of e-mail took place between October 23 and October 31 when Tori was again invited, on the afternoon of October 31, to engage in a private chat with Captain Jake which also included graphic descriptions of sexual activities. At that time, in response to Tori’s request for “pics”, Captain Jake requested e-mail assuring him that Tori was “not a cop” (which was provided), and suggested another telephone call and a meeting.
On the evening of October 31 and continuing into the morning of November 1, in the course of another cyberchat, Captain Jake e-mailed several photographs to Tori. The first three or four were nude women or girls, followed by a number of clearly pornographic photographs. Exhibit 19, a photograph entitled “PTCUMTG.JPG”, attached to e-mail transmitted to Tori 83 at 12 minutes and 44 seconds after midnight on November 1, 1996, depicts the face, breasts and extended tongue of a female in pigtails adjacent to an erect penis. This photograph was the subject of one count of promoting an obscene sexual performance by a child and one count of promoting a sexual performance by a child, both of which were rejected by the jury as not proved.[6] Among the photographs transmitted during the cyberchat, at 22 minutes and 45 seconds after midnight, is exhibit 23 entitled “12 FUK.JPG", depicting, in a collage of four photographs, a nude female in pre- or early adolescence engaged in genital sexual intercourse. This photograph is the subject of count 1, promoting an obscene sexual performance by a child (Penal Law § 263.10) upon which the jury rendered a verdict of guilty.
Exhibits 19 and 23 and the accompanying private cyberchat (exhibit 13) containing detailed graphic descriptions of the sex acts Captain Jake was interested in performing upon Tori, as *719 well as explicit instructions to her regarding masturbation which she was intended to follow while viewing the photos and communicating with Captain Jake, are the basis of count 7, attempted disseminating indecent material to minors in the first degree. Count 8, charging the same crime, is also premised upon these communications of November 1 but the actual meeting of December 23 is the basis for the attempt to induce sexual activity required under subdivision (2) of Penal Law § 235.22.
Following the cyberchat and photo transmissions of November 1, on November 4 Tori sent an e-mail to Captain Jake thanking him for the pictures, to which Captain Jake responded briefly on November 5, to which Tori also replied that day. On November 11, 1996, Captain Jake sent Tori an e-mail proposing a meeting “in New York on Wednesday the 13th” (exhibit 27). As Inspector Hayes did not actually receive the message until the 13th, Tori was unable to meet with Captain Jake and so advised him. On November 21, Jake sent another e-mail to Tori suggesting a meeting “the day after Thanksgiving” (exhibit 29), but this message was not received until November 25 and, because, according to Inspector Hayes, “Tori 83 had to visit family in Pennsylvania” (transcript, at 583), the meeting was not possible. However, on November 25 at 11:34 p.m., Captain Jake inquired by e-mail where the meeting could take place in Brooklyn at 10:30 a.m. Friday. The message was received on November 29 and was not answered.
On December 11, Tori received an instant message from Jake indicating he would be in Morristown, New Jersey, every Thursday and Friday and could travel to Brooklyn to meet Tori. A tentative meeting was set for Friday evening at “the boat” (exhibit 31). Tori e-mailed directions to “the boat” at the Tamaqua Fishing Station in Gerritsen Beach at 4:00 p.m. on December 12, confirming the date for Friday (exhibit 32). At 9:54 p.m. on December 12, Captain Jake canceled the date but invited an alternative. On December 13, Tori responded that she would try to “get away” as requested on Monday (exhibit 34). Tori confirmed the meeting for Monday, but Jake canceled again, explaining he had lost his job but still wanted to meet Tori. Another apology was e-mailed to Tori on December 18. Tori responded minutes later that she had actually kept the Monday appointment because she had received the cancellation too late. Captain Jake replied with another apology. On December 20, Tori proposed a meeting on Monday, December 23. At 17 minutes past midnight on December 22, Captain Jake declined, indicating that visiting relatives would prevent *720 a meeting before January. Later that day, Captain Jake indicated he could meet Tori in the morning on December 23. Following this e-mail, Tori and Captain Jake and a third person identified as “Bibi 1980”, a 16-year-old girl in Munich, Germany, had a private chat, initiated by instant message from Captain Jake (exhibit 44). The meeting was confirmed for the following day at 11:00 a.m. on the boat “Alert”. Captain Jake cautioned: “It must be our secret or I will go to jail.”
On December 23, 1996, Inspector Hayes, three detectives from his office and a diminutive, youthful Police Officer Ines Perez posing as Tori 83, went to the Tamaqua Fishing Station. Inspector Hayes stationed himself inside the boat “Alert” and Officer Perez was stationed inside the cockpit where she would be visible to anyone approaching from the ramp. At approximately 11:00 A.M., a black Oldsmobile with Connecticut plates matching the description of one of the vehicles registered to defendant entered the parking lot. A male got out, went to the trunk of the car and, after looking around, proceeded down the ramp to the “Alert”. As defendant approached the boat, Officer Perez asked if he was Captain Jake, to which defendant replied, “Yes. Are you Tori?” (Transcript, at 649.) Inspector Hayes immediately exited through the cockpit and identified himself. Defendant acknowledged that he was James Barrows and, in response to a question, indicated that he was carrying a knife. As the knife was removed from his pocket, defendant stated, “I never touched her. I didn’t do anything. I never touched her” (transcript, at 650). In a videotaped statement, defendant subsequently admitted that he was Captain Jake and had sent various photographs to Tori. Defendant also acknowledged that he had come to Brooklyn to meet Tori. From the trunk of defendant’s car, police seized numerous pornographic magazines, computer disks, three short pieces of nylon boat line, paper towels and a plastic bag containing Q-tips and a lubricant called “Wet”.[7]
Following arrest, defendant was advised that a warrant would be sought to search his home and seize his computer equipment. Seeking to avoid possible damage and particularly to avoid having the search conducted while his wife was at home, defendant consented to the search and provided diagrams indicating the location of a spare key and the computers in the house. These were faxed to Connecticut police who went *721 to defendant’s home in Madison, Connecticut, and seized various papers and magazines and downloaded a backup tape of the America Online and Netscape files from defendant’s computer hard drive which was admitted as People’s exhibit 1.
Preceding the afore-stated evidence, as foundation for the case, Detective Donald Callahan of the Computer Investigations and Technology Unit of the New York City Police Department, qualified as an expert in the field of computer technology, explained the mechanics of computers and the use of the Internet and America Online. Using a 386-class computer connected through a modem to America Online, via a projector which simultaneously displayed on a movie screen visible to all in the courtroom exactly what was being transmitted to the monitor, Detective Callahan gave a live demonstration of the services available through America Online and the Internet including the use of passwords, screen names, profiles, cyberchats, e-mail, “flash mail”, private chat rooms, instant messages and “trading pics”.[8] During trial, the jury and court witnessed the course of a live cyberchat beginning with the selection of “People Connection” from the America Online main menu, which provides access to chat rooms, to “Town Square 504”. The profiles of other participants in the chat were displayed and instant messages were sent to and received from various participants whose true identities were unknown. One profile indicated a participant in Orange County, California; others were from Massachusetts, Ohio and Virginia. Detective Callahan was invited to a private chat room by “James 25 Years” who had an Internet Website called “eroticsluts.home.ml.org”. (Transcript, at 112.) During cross-examination, while logged-on and seeking entry to a chat room, Detective Callahan received an unsolicited message from NYCALLAMER: ‘What’s up. Sent you my pic,” which was directed to XXXRIMJOB in Virginia. An attached photo (ALLAN.JPG) was ultimately displayed of a nude adult male standing in a shower (transcript, at 333-337). The photo was automatically saved to Detective Callahan’s hard drive.
Following this general demonstration, at defendant’s insistence, 24 photographs stored in defendant’s hard drive seized from his home in Connecticut, none of which was People’s exhibit 19 or 23, the subjects of the charges, were displayed to *722 the jury. Many were pornographic. In addition, a text file, “KELLYMA”, containing an instant message chat on December 12, 1996, between Captain Jake and “Kelly . . . 13f’ from Weymouth, Massachusetts, was displayed in which, in the course of a sexually explicit conversation, Captain Jake states: “Well, I’m old enough to be your father and then some, but I would love to have sex with you.” He concludes: “Send me an e-mail telling me that you want to have sex and attach an appropriate pic. I’m really serious. I want to have sex with you if you want to. We can meet.” (Transcript, at 213-215; exhibit 1-X.) Also identified on People’s exhibit 1 were e-mail messages from Tori 83 to Captain Jake and chats between Tori 83 and Captain Jake, as well as various other transmissions unrelated to the charges from all over the country. One such chat was with “Hot Bakla 15 female from Chicago” who was asked by Captain Jake about her sexual preferences and experience and whether, “If I come to Chicago, will you meet with me and have sex?” (Transcript, at 363-365.)
THE LAW
Deputy Inspector Hayes undertook his investigation in May 1996 seeking child pornography transmitted via the Internet in violation of Penal Law article 263. Effective November 1, 1996, however, article 235 of the Penal Law was amended to specifically prohibit the dissemination of communications depicting nudity, sexual conduct or sado-masochistic abuse to minors under the age of 17 via the Internet. (L 1996, ch 600.)[9] The statute under which defendant was prosecuted in counts 7 and 8 reads:
“§ 235.22 Disseminating indecent material to minors in the first degree
“A person is guilty of disseminating indecent material to minors in the first degree when:
“1. knowing the character and content of the communication which, in whole or in part, depicts actual or simulated nudity, sexual conduct or sado-masochistic abuse, and which is harmful to minors, he intentionally uses any computer communication system allowing the input, output, examination or *723 transfer, of computer data or computer programs from one computer to another, to initiate or engage in such communication with a person who is a minor; and
“2. by means of such communication he importunes, invites or induces a minor to engage in sexual intercourse, deviate sexual intercourse, or sexual contact with him, or to engage in a sexual performance, obscene sexual performance, or sexual conduct for his benefit.”
The New York statute in substance tracks the Federal Communications Decency Act (CDA) of 1996 (47 USC § 223 [a] [1] [B]; [d];[10] see, American Libs. Assn. v Pataki, 969 F Supp 160, 183, supra).
In Reno v American Civ. Liberties Union (521 US 844, 117 S Ct 2329 [1997], supra), the CDA’s prohibitions against “indecent” and “patently offensive” transmissions to minors were held to abridge the First Amendment’s guarantee of freedom of speech. The United States Supreme Court affirmed *724 the decision of the three-Judge District Court in Pennsylvania enjoining enforcement of the CDA provisions as both overbroad and vague in contravention of the First Amendment. (See, American Civ. Liberties Union v Reno, 929 F Supp 824 [ED Pa 1996], supra.) Finding that the CDA is content-based and is not, therefore, susceptible of time, place and manner analysis, the Supreme Court found that the Federal law “applies broadly to the entire universe of cyberspace” and, as such, could not be sustained consistent with the “most stringent review” appropriate to its purpose (Reno v American Civ. Liberties Union, 521 US, at —, 117 S Ct, at 2342-2343). Declining to discuss the Fifth Amendment vagueness findings enunciated by Judges Sloviter and Buckwalter at the District level, the Supreme Court found the statute to be facially overbroad in contravention of the First Amendment.
Even as the Supreme Court was deliberating on the Reno case (supra), in American Libs. Assn. v Pataki (969 F Supp 160 [SD NY 1997], supra), District Court Judge Preska, while deferring the First Amendment issue pending the Reno decision, held New York Penal Law § 235.21 (3) to be unconstitutional in violation of the Commerce Clause. The language of section 235.21 (3), which defines, in part, the crime of disseminating indecent material to minors in the second degree, mirrors that of subdivision (1) of section 235.22. Like the CDA, both sections 235.21 (3) and 235.22, unlike subdivisions (1) and (2) of section 235.21 which also define the crime of disseminating indecent material to minors in the second degree but are expressly confined to commercial activity, are unlimited in application and therefore apply universally to any computer transmission by any person. Section 235.21 does not, however, include the element contained in section 235.22 (2) that the violator “importune [ ], invite [ ] or induce” such minor to engage in sexual intercourse, deviate sexual intercourse or sexual contact.
DISCUSSION
The instant case differs from both Reno and American Libs. (supra) in three salient respects. First, unlike the institutional plaintiffs who facially challenged the Federal CDA and Penal Law § 235.21, defendant herein has actually been criminally prosecuted and a fully developed record is available. More compelling is the fact that defendant’s criminal purpose was exactly that which the statutes were enacted to thwart. Although charged with “attempted” dissemination of the prohibited com *725 munications because of the fictional identity of “Tori 83” and the physical impossibility of meeting all of the statutory elements, there can be no doubt as to defendant’s intention to engage a child in sexual activity through the use of the Internet. Had Tori 83 actually been a 13-year-old girl, the probable outcome of defendant’s meeting with her requires little speculation. Based upon the evidence at trial, other criminal charges would almost certainly be before this court had such a meeting taken place.[11] Equally troubling, there is no way of knowing how many other Toris have been the victims of defendant’s computer wiles as it is unlikely that such trysts would be reported by a presumably willing adolescent victim. Finally, the statutes under which defendant has been prosecuted are not identical to the CDA or Penal Law § 235.21.
The evidence at trial clearly corroborated the findings of several courts that the Internet is a unique, international, as well as interstate, phenomenon. (See, e.g., Reno v American Civ. Liberties Union, supra; American Libs. Assn. v Pataki, supra; Shea v Reno, 930 F Supp 916 [SD NY 1996]; American Civ. Liberties Union v Reno, 929 F Supp 824, supra.) The live courtroom demonstration established that there is much anonymity, uncertainty and lack of control in using the Internet. Indeed, the Internet offers a “brave new world” of communication which, although as Judge Preska suggests, is analogous in some ways to a railroad, is really unlike any other previously regulated form of communication. Like personal conversation, it appears to be private, yet is actually very public. There is presently no practical way to control the dissemination or receipt of communications. It is not uncommon for an Internet user to receive uninvited commercial or personal solicitations, photographs and other messages from anywhere in the world. Nor is it possible for the “speaker” to control with certainty the route or ultimate destination of his or her message. The standards of propriety are no longer confined to those of a particular geographical or political community. At the same time, there can be no doubt that defendant intentionally sought out users he had reason to believe were in fact children and intended and attempted to engage them in sexual activities. In this respect, the evidence sustains the findings of Congress and *726 the various States that have enacted the challenged laws prohibiting the use of the Internet for such purpose, including New York, that this new technology has become a common tool for the pedophile and that such application of Internet technology transcends State and national borders. (See, e.g., American Libs. Assn. v Pataki, 969 F Supp, supra, at 168, 170; Governor’s Mem approving L 1996, ch 600, 1996 McKinney’s Session Laws of NY, at 1900-1901.)
(1)
In Reno (supra), the Federal attempt to regulate the use of the Internet so as to prevent the transmission of not only obscene, but also “indecent” or “patently offensive”, messages to persons under 18 was struck down as overbroad because of “the many ambiguities concerning the scope of its coverage” (Reno v American Civ. Liberties Union, 521 US, at —, 117 S Ct, at 2344). While declining to rule upon the Fifth Amendment aspect of the vagueness doctrine, the Supreme Court found the failure to adequately define the term “indecent” particularly critical, especially as that term left no exceptions for communications containing serious literary, artistic, political or scientific value as required under Miller v California (413 US 15 [1973]), which defines the test for obscenity. Unlike the CDA, however, which is not limited to materials that are “obscene” and therefore outside the protection of the First Amendment, New York’s Penal Law § 235.20 (6) does define what is “harmful to minors” as:
“[T]hat quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sado-masochistic abuse, when it:
“(a) Considered as a whole, appeals to the prurient interest in sex of minors; and
“(b) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and
“(c) Considered as a whole, lacks serious literary, artistic, political and scientific value for minors.
Thus, the New York law expressly incorporates for minors the standard set forth in Miller (413 US, supra, at 24) for unprotected obscenity and the jury was so charged.[12] See also Ginsberg v New York (390 US 629, 643 [1968]), in which this *727 definition was held to give adequate notice of what is prohibited consistent with due process. It has long been recognized that States have the power and the right to define the First Amendment rights of minors more narrowly than those of adults. (Ginsberg v New York, supra, at 638; Bookcase, Inc. v Broderick, 18 NY2d 71, 75 [1966]; Calderon v City of Buffalo, 61 AD2d 323, 331 [4th Dept 1978].) Since the term “indecent” has been statutorily defined consistent with the constitutional standard for obscenity, which is not protected under the First Amendment, Penal Law § 235.22 does not suffer from the unconstitutional facial vagueness or overbreadth of the CDA in this regard. (See, Reno v American Civ. Liberties Union, supra, 521 US, at —, 117 S Ct, at 2341.) However, the Reno Court found the CDA unconstitutional in violation of the First Amendment upon grounds of overbreadth upon a second analysis which is equally applicable to New York’s statute.
(2)
In Reno (521 US 844, 117 S Ct 2329, supra), the Supreme Court rejected the applicability of prior rulings approving limitations upon the exercise of First Amendment rights based upon the nature of the medium of the Internet. Although the “harmful to minors” standard of the New York statutes was approved as meeting constitutional muster, even Ginsburg (supra) was distinguished as limited to a statute regulating exclusively commercial transactions. Federal Communications Commn. v Pacifica Found. (438 US 726 [1978]), relating to the afternoon broadcast of George Carlin’s twelve “Filthy Words” which was administratively condemned by the Federal Communications Commission (FCC) as “indecent” and “patently offensive” though not obscene, was distinguished by the longstanding policy of regulating the limited medium of radio waves which generate broadcasts readily available to all, including children, without effort on the part of the recipient. The nonpenal nature of FCC regulation, for which there is no historical precedent for cyberspace, was cited as particularly significant (Reno v American Civ. Liberties Union, supra, 521 US, at —, 117 S Ct, at 2341-2342). Under both the CDA and New York’s *728 statute, incarceration is a possibility. In Renton v Playtime Theatres (475 US 41 [1986]), a zoning restriction banning adult movie theatres from residential neighborhoods was upheld because it was based not upon the content of the films, but upon the “secondary effects” on the geographical community which were found to justify a time, place and manner regulation of the First Amendment-protected expression (Reno v American Civ. Liberties Union, 521 US, at —, 117 S Ct, at 2342). Distinguishing Turner Broadcasting Sys. v Federal Communications Commn. (512 US 622 [1994]), in which a requirement that cable operators carry signals of local broadcasters was held not to violate the First Amendment per se because it was content-neutral, from Sable Communications v Federal Communications Commn. (492 US 115 [1989]), in which a prohibition against “indecent” telephone messages was stricken as unconstitutional, the Court found that the scarcity of the broadcasting medium and its invasive nature both justified more extensive regulation of First Amendment rights exercised across the air waves than does the nature of cyberspace accessed by wire through the Internet. Noting the several affirmative steps that must be taken to engage cyberspace and the warnings that generally precede commercial or institutionally provided sexually explicit information, as well as the pervasive availability of the medium, not only to commercial or institutional agencies, but to every individual in the world with access to a computer, the Supreme Court concluded that precedent “provide[s] no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium” (521 US, at —, 117 S Ct, at 2344).
In holding the CDA unconstitutional, the Supreme Court found that the statute was both vague and overbroad in chilling all communication through the Internet, between adults as well as children. The Supreme Court noted (Reno v American Civ. Liberties Union, supra, 521 US, at —, 117 S Ct, at 2347): “The breadth of the CDA’s coverage is wholly unprecedented * * * [T]he scope of the CDA is not limited to commercial speech or commercial entities. Its open-ended prohibitions embrace all non-profit entities and individuals posting indecent messages or displaying them on their own computers in the presence of minors * * * Moreover, the ‘community standards’ criterion as applied to the Internet means that any communication available to a nation-wide audience will be judged by the standards of the community most likely to be offended by the message.”
*729 The international, geographically borderless nature of the Internet’s reach, regardless of the speaker’s intent, was a major factor in the Supreme Court’s finding that the CDA is facially unconstitutional. This finding applies equally to the New York statute which, though not as vague as the CDA in light of the definition of what is “harmful to children”, does suffer from the same imprecision and overbreadth in failing to provide a clear and predictable definition of what transmissions will be deemed “patently offensive to prevailing standards” of a universal audience. Were it possible to confine the use of the Internet within the State of New York, perhaps the statute would be enforceable, but that is neither possible, as evidenced by the case at bar, nor, in light of the potential of the Internet, is it desirable to so restrict such communication. The inevitable dilemma faced by the Internet user who wishes to transmit ideas which are sexual in nature or which contain even simulated nudity is whether such expressions will offend the standards of any community within the vast range of transmission as to what is “suitable” for children. Moreover, while the statutory standard prohibits only what is obscene for children, because of the nature of the Internet, all Internet communication must, as a practical matter, be tailored to that standard to avoid possible prosecution regardless of the intended audience, thus “ ‘reducing] the adult population * * * to * * * only what is fit for children’ ” in violation of the First Amendment. (See, Sable Communications v Federal Communications Commn., supra, 492 US, at 128; Butler v Michigan, 352 US 380, 383 [1957].) As the Court noted in Reno, citing Sable, “ ‘[s]exual expression which is indecent but not obscene is protected by the First Amendment’ ” (Reno v American Civ. Liberties Union, supra, 521 US, at —, 117 S Ct, at 2346).
Clearly critical to the Court’s decision in Reno (supra) is the fact that the Internet cannot be contained; there is no way, with present technology, to limit the reach of communications launched upon the Internet. Rejecting the Government’s argument that the requirement that there be knowledge of the recipient’s age insulates the innocent or reputable adult speaker from criminal prosecution, the Supreme Court noted that “most Internet fora — including chat rooms, news-groups, mail exploders, and the Web — are open to all comers” (Reno v American Civ. Liberties Union, 521 US, at —, 117 S Ct, at *730 2349).[13] In these contexts, it is not feasible for a speaker to inquire as to the age of each participant in a multi-user forum where many participants are brief transients. The Court showed special concern for the possible “heckler’s veto” by which any opponent of a particular message “might simply log on and inform the would-be discoursers” of the presence of a person under the age of 17, thereby chilling any further communication among adult participants (Reno v American Civ. Liberties Union, 521 US, at —, 117 S Ct, at 2349). The Court also expressed its special concern with the chilling effect of the penal aspect of the CDA noting: “In addition to the opprobrium and stigma of a criminal conviction, the CDA [like Penal Law § 235.22] threatens violators with penalties including up to two years in prison for each act of violation. The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images” (Reno v American Civ. Liberties Union, 521 US, at —, 117 S Ct, at 2344-2345). Referring to its comment in Sable Communications v Federal Communications Commn. (492 US, supra, at 127), that “the speech restriction at issue there amounted to ‘burning] the house to roast the pig’ ”, the Court remarked: “The CDA, casting a far darker shadow over free speech, threatens to torch a large segment of the Internet community” (Reno v American Civ. Liberties Union, 521 US, at —, 117 S Ct, at 2350). Notwithstanding the laudable purpose of protecting children from harmful materials, given the nature of the medium of the Internet, the Court concluded: “The interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship” (Reno v American Civ. Liberties Union, 521 US, at —, 117 S Ct, at 2351).
*731 (3)
Interestingly, although in American Libs. (969 F Supp 916, supra) the District Court sought to avoid the First Amendment analysis, deferring to the Reno case (supra) then pending in the Supreme Court and basing its ruling exclusively upon the Commerce Clause, the rationale for its conclusions is remarkably similar to that in Reno notwithstanding that Reno is premised upon the First Amendment. The Southern District Court, like the Supreme Court, was concerned that “[t]he unique nature of the Internet highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even outright inconsistent regulation by States [or communities] that the actor never intended to reach and possibly was unaware were being accessed” (American Libs. Assn. v Pataki, 969 F Supp, at 168-169). Having determined that New York’s statute offends the Commerce Clause of the United States Constitution by necessarily exporting New York’s domestic policies (specifically, its community standards as to what is appropriate material for minors) into other States, the District Court found that the extraterritorial effects of the New York statute would be likely to chill all interstate commerce of ideas and is, therefore, overbroad.
Analogizing the Internet to interstate railroads in which the effects of individual State regulation cannot be contained within the borders of a particular State, and noting that the Internet has substantial commercial application nationally and internationally, the District Court found the Commerce Clause applicable and concluded that the New York statute “cannot survive such scrutiny, because it places an undue burden on interstate traffic, whether that traffic be in goods, services, or ideas” (American Libs. Assn. v Pataki, supra, at 173). In enjoining enforcement of Penal Law § 235.21 (3),[14] the District Court found that the New York statute violates both aspects of the Commerce Clause by giving extraterritorial effect to the policies of New York, thus exceeding the regulatory authority of any State within the Federation, and by impinging upon the principle of preemption by which authority to regulate interstate commerce is exclusively vested in the Federal Government. The prohibited consequence is to chill all communication *732 via the Internet because of the uncertainty nationwide of what standards apply and the concomitant risk of self-censorship to avoid prosecution.
At issue in American Libs. (supra) was Penal Law § 235.21 (3) which is identical to subdivision (1) of section 235.22 at issue in the case at bar. However, Penal Law § 235.22 includes, as aforementioned, a second element of the crime: that “by means of such [Internet] communication” (prohibited under subdivision [1]), the violator “importunes, invites or induces a minor to engage in sexual intercourse, deviate sexual intercourse, or sexual contact with him, or to engage in a sexual performance, obscene sexual performance, or sexual conduct for his benefit.” (Penal Law § 235.22 [2].) According to Merriam-Webster’s Collegiate Dictionary (10th ed 1993), “importune” means “to press or urge with troublesome persistence” (at 583), “invite” means “to offer an incentive or inducement to: entice * * * to request the presence or participation of’ (at 617), and “induce” means “to move by persuasion or influence * * * to call forth or bring about by influence or stimulation” (at 594). As reprehensible as defendant’s crime is, his actual “conduct”, as prohibited by the statute, amounts only to speech in its purest form. The action which the statute seeks to prevent is required to be taken, not by the “speaker”, but by the recipient of the message. This element was satisfied as to count 8 when defendant took the additional step of tending to effect the reality of sexual conduct by meeting with Tori in Brooklyn.
The gravamen of count 7, however, apart from the proscribed use of the Internet to transmit the photographs which are exhibits 19 and 23 and the cyberchat, all of which are forms of “speech”, is the alleged inducement of Tori 83 to masturbate during the cyberchat. While such “conduct” would appear to satisfy subdivision (2) of Penal Law § 235.22,[15] given the nature of the Internet, in most cases, the proof that such activity actually took place would be limited to the testimony of the recipient of the transmission. Generally, as was the case with Tori 83, such suggestions are likely to be “mere words”, unaccompanied by any overt or provable acts. In those instances in which physical acts have occurred, either in the presence of or with the participation of the Internet speaker, other criminal laws are available as an appropriate sanction. To the extent *733 that such communications are practically limited to pure speech, this court finds they fall within the parameters of Reno (521 US 844, 117 S Ct 2329, supra) in that, both as applied to the particular facts of this case and in light of the nature of the Internet, the statute is unconstitutionally vague in also chilling First Amendment-protected communications between adults via the Internet. To the extent that such communications involve interstate transmissions, Penal Law § 235.22 also violates the Commerce Clause. Accordingly, as to count 7, the verdict must be set aside.
Under count 8, satisfaction of subdivision (2) of Penal Law § 235.22 is premised upon defendant’s entry into the State of New York for the purpose of engaging in live sex acts with Tori 83, presumably a child under the age of 17. All persons are presumptively on notice that sexual intercourse between a man of 55 and a girl of 13 is a crime per se, unless they are married to each other. The totality of the circumstances of defendant’s appearance at the Tamaqua Fishing Station, together with the substance of his cyberchats with Tori, establish that such was his intent. Moreover, defendant’s repeated concerns that he would “go to jail” for engaging in such activity indicates that he was well aware that what he was proposing to Tori 83 was illegal, as well as immoral. Since such purposeful acts on defendant’s part clearly evidence an intent to commit a crime within the State of New York (see, Penal Law art 130), the constraints of the Commerce Clause do not apply. The standards for prohibited conduct are being enforced entirely within New York, thus overcoming the problems both of extraterritoriality and preemption. The prosecution at bar is not, therefore, enjoined under American Libs. (supra) as violative of the Commerce Clause.
This court does not find it possible, however, to reconcile Penal Law § 235.22 with the findings in Reno (supra) so as to overcome the challenge to this statute as facially unconstitutional under the First Amendment. First, the two subdivisions of the statute cannot be separately parsed to avoid the vagueness flaw found in subdivision (1) in American Libs. (supra). The statute reads in the conjunctive, requiring both the prohibited transmission via the Internet under subdivision (1) and the use of such communication to “importune”, “invite” or “induce” some action on the part of the minor. All of the impediments to constitutionality under the First Amendment that apply to Penal Law § 235.21 (3) are therefore applicable, as are the overbreadth concerns expressed in Reno. Defendant may *734 be a dangerous predator, but, as the Supreme Court noted in Reno with respect to the CDA’s comparable prohibitions, “a parent allowing her 17-year-old to use the family computer to obtain information on the Internet that she, in her parental judgment, deems appropriate could face a lengthy prison term” (521 US, at —, 117 S Ct, at 2348). As unlikely as it is that the minor would engage in sexual conduct directly for the parent’s “benefit”,[16] it is certainly not too remote that some information so derived might be subsequently applied in sexual activity by the child, thus subjecting the parent to possible prosecution notwithstanding the long-recognized principle that parental authority over the rearing of children is paramount and “basic in the structure of our society” (Ginsberg v New York, 390 US 629, 639, supra).[17]
The absence of a clear and uniform national standard of what is appropriate for children (an impossibility, according to the Supreme Court [see, Miller v California, 413 US 15, 30-34, supra)) and the extreme and often volatile differences regarding “moral” standards among various communities exacerbates the risk that statutes like Penal Law § 235.22 will be deliberately misapplied to effect a chill over ways of thinking that are deemed “wrong” by some. See Reno (supra, 521 US, at —, 117 S Ct, at 2345) in which the Court noted that the “ ‘risk of discriminatory enforcement’ of vague regulations” heightens the First Amendment concerns. Given the unique and pervasive nature of the medium, together with the inherent vagueness of the terms “importune”, “invite” and “induce” and the equally vague and far-reaching term “for his benefit” (Penal Law § 235.22 [2]) used to describe elements of a crime which requires action by a third person, it is apparent that enforcement of Penal Law § 235.22 affords the opportunity to insidiously chill virtually all communication on the Internet related to sex, whether protected by the First Amendment or not and regardless of the ages of the discoursers.
Accordingly, this court is constrained under Reno (supra) to find Penal Law § 235.22 to be unconstitutionally vague and overbroad in violation of the First Amendment to the United States Constitution. The motion to set aside the verdict with *735 respect to both counts 7 and 8 is granted and those counts are dismissed.
(4)
Defendant James Barrows was also convicted of one count of promoting an obscene sexual performance by a child under Penal Law § 263.10.[18] As previously noted, the subject of this count was exhibit 23, the photograph entitled “12 FUK.JPG”. Defendant also moves to set aside this verdict arguing that Penal Law § 263.10 is, like section 235.22, vague and over-broad and violates the Commerce Clause of the United States Constitution.
Unlike Penal Law § 235.22, section 263.10 is unrelated to the age of the recipient of the proscribed communication. In enacting Penal Law article 263, the New York Legislature found “a proliferation of exploitation of children as subjects in sexual performances”, declaring that “[t]he public policy of the state demands the protection of children from exploitation through sexual performances.” (L 1977, ch 910, § 1.) Article 263 was thus enacted for the protection of the child performers who were necessarily exploited and abused in the process of creating the pornographic communication.[19] (New York v Ferber, 458 US 747 [1982], supra; People v Keyes, 75 NY2d 343, 346 [1990]; People v Gaito, 199 AD2d 615, 616 [3d Dept 1993].) The statute was expressly intended to chill the market for this contraband by criminalizing its possession and thereby to eliminate the child abuse inherent in its production. (See, New York v Ferber, at 759-760; People v Keyes, at 348; see also, Osborne v Ohio, 495 US 103, 109-110 [1990], supra [wherein the *736 prohibition against private possession of child pornography was found to be constitutional].) Child pornography, like obscenity, is not protected under the First Amendment. In upholding the constitutionality of New York’s Penal Law § 263.15, which criminalizes the promotion of any sexual performance by a child under 16 regardless of whether it is “obscene”, the United States Supreme Court so held (New York v Ferber, at 750, 764). The Court took care to reject the application of the Miller obscenity standard to child pornography, finding the subject matter itself to be unprotected regardless of its effect upon the average person.[20]
In fact, the production and/or dissemination of child pornography is statutorily proscribed in virtually all States and by Federal legislation (New York v Ferber, supra, at 749, 758). In Ferber, the Supreme Court found that because “a State’s interest in ‘safeguarding the physical and psychological well-being of a minor’ is ‘compelling’ [citing Globe Newspaper Co. v Superior Ct., 457 US 596, 607 (1982)]” (at 756-757), “[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance” (at 757), warranting “greater leeway [to States] in the regulation of pornographic depictions of children” (at 756). Moreover, the Court noted the inherently illegal, indeed criminal, nature of the conduct required in producing child pornography which itself justifies removing such “expression” from the protection of the First Amendment (New York v Ferber, at 761-762). In Osborne v Ohio (supra, 495 US, at 110, citing New York v Ferber, at 761-762, and quoting Giboney v Empire Stor. & Ice Co., 336 US 490, 498 [1949]), the Court reiterated: “ ‘ “It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.” ’ ” In rejecting the New York Court of Appeals finding that the statute is unconstitutionally overbroad, the Supreme Court stated: “We consider this the paradigmatic case of a state statute whose legitimate reach dwarfs its arguably impermissible applications” (New York v Ferber, at 773).
In light of the unequivocal rulings of the Supreme Court in Ferber and in Osborne (supra), there is clearly no merit to *737 defendant’s challenge to the constitutionality of Penal Law § 263.10. The motion to set aside the verdict of guilty under count 1 is denied.

. Although not notified upon the omnibus motion of the challenge to the New York statutes’ constitutionality, at this court’s direction, the Attorney-General of the State of New York was served with defendant’s motion to set aside the verdict and has declined to seek intervention by letter dated May 14, 1998.

. An “instant message” can only be sent in “real time” to someone who is “on line”, that is, using the computer and connected to the Internet at the time the message is sent. “E-mail” is a message that can be sent at any time and stored for future reading if the addressee is not on line when the message is sent.

. An exhaustive description of the Internet and its various uses is set forth in both the Supreme Court’s decision in Reno (521 US, at —, 117 S Ct, at 2334-2337, supra) and in Judge Preska’s opinion in American Libs. (969 F Supp, supra, at 164-167; see also, American Civ. Liberties Union v Reno, 929 F Supp 824, 830-849 [ED Pa 1996]).

. Inspector Hayes monitored the conversation which was to have been recorded, but when played back, a technical problem was discovered that had resulted in a blank tape.

. On cross-examination, Inspector Hayes testified that “B/D” refers to “bondage and discipline”. This was corroborated by defendant in his *718 videotaped statement during which he also explained that “D/S” stands for “dominant submissive” (exhibit 53).

. During deliberations, the jury asked whether the person in the photograph must actually be under 16, as opposed to merely representing a child. They were instructed that they must find that the “performer” actually was under 16.

. On cross-examination, Inspector Hayes testified that in one of the e-mail communications Captain Jake told Tori that he sometimes ties up his sex partners and “pretends” to force them (transcript, at 669; exhibit 1-BB).

. This elementary demonstration may have been unnecessary for most of the jurors, two of whom were actually employed in the computer industry and most of whom indicated on voir dire that they used computers regularly and were personally familiar with the technology and the Internet.

. In response to defense counsel’s questions, Deputy Inspector Hayes testified that he first learned of the change in the law on October 31, 1996. Defendant argued entrapment and, although the court denied a request to charge such defense as not supported by the evidence, the jury requested an instruction on entrapment during deliberations, which was given. Apparently the jury also concluded that the defense was inapplicable.

. The Federal statute, as amended, provides (47 USC § 223):
“§ (a) Prohibited general purposes
“Whoever—
“(1) in interstate or foreign communications * * *
“(B) by means of a telecommunications device knowingly—
“(i) makes, creates, or solicits, and
“(ii) initiates the transmission of,
“any comment, request, suggestion, proposal, image, or other communication which is obscene or indecent, knowing that the recipient of the communication is under 18 years of age, regardless of whether the maker of such communication placed the call or initiated the communication * * *
“shall be fined under Title 18, or imprisoned not more than two years, or both * * *
“(d) Sending or displaying offensive material to persons under 18
‘Whoever—
“(1) in interstate or foreign communications knowingly—
“(A) uses an interactive computer service to send to a specific person or persons under 18 years of age, or
“(B) uses any interactive computer service to display in a manner available to a person under 18 years of age,
“any comment, request, suggestion, proposal, image, or other communication that, in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs, regardless of whether the user of such service placed the call or initiated the communication; or
“(2) knowingly permits any telecommunications facility under such person’s control to be used for an activity prohibited by paragraph (1) with the intent that it be used for such activity * * *
“shall be fined under Title 18, or imprisoned not more than two years, or both.”

. Even under the facts developed at trial, defendant could have been prosecuted for attempted statutory rape (Penal Law §§ 110.00, 130.30) or attempted sexual abuse (Penal Law §§ 110.00, 130.60) having articulated the intent to commit such crimes and having acted to effect the commission thereof by meeting Tori in Brooklyn.

. The jury was instructed that in order to find defendant guilty under counts 7 and 8 of attempted disseminating indecent material to minors in *727 the first degree, they must find, in addition to finding the defendant intentionally transmitted the photographs and chat which he knew depicted nudity and sexual conduct to a person he believed to be under the age of 17, that the communications were in fact “harmful to minors” in conformity with the statutorily defined standard. In addition, the jury was required to find that “by means of such communications,” defendant had importuned, invited or attempted to induce Tori 83 to engage in sexual acts for his benefit.

. Both Reno and American Libs. (supra) give extensive consideration to the defenses provided in both the CDA and the New York statute and the infeasance, given present technology, of effectively restricting the scope of Internet communication. The Federal courts rejected the argument, also raised by the District Attorney herein, that such defenses could save the statutes, both because they are impractical and because their efficacy depends on a successful defense to actual prosecution, itself a chilling prospect. Moreover, under the New York law, it is not an element of the crime that the sender have knowledge of the age of the recipient of the message. (Donnino, Practice Commentaries, McKinney’s Cons Laws of NY,- Book 39, Penal Law § 235.21, at 202; Governor’s Mem approving L 1996, ch 600, 1996 McKinney’s Session Laws of NY, at 1901.)

. As Judge Preska noted, only section 235.21 (3) was challenged in American Libs. and not section 235.22, the basis of the instant prosecution, which criminalizes “luring children into sexual contact by communicating with them via the Internet” (supra, at 179). Her decision was, therefore, confined to the challenged statute.

. “ ‘Sexual conduct’ means acts of masturbation, homosexuality, sexual intercourse, or physical contact with a person’s clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, breast.” (Penal Law §235.20 [3].)

. Penal Law § 10.00 (17) provides: “ ‘Benefit’ means any gain or advantage to the beneficiary and includes any gain or advantage to a third person pursuant to the desire or consent of the beneficiary.”

. Ginsberg (supra), as noted in Reno (supra), concerned only statutory regulation of the commercial sale of obscene literature to children, expressly leaving to parental discretion the right to provide such materials to children.

. “A person is guilty of promoting an obscene sexual performance by a child when, knowing the character and content thereof, he produces, directs or promotes any obscene performance which includes sexual conduct by a child less than sixteen years of age.” (Penal Law § 263.10.) “ ‘Promote’ means to procure, manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmute, publish, distribute, circulate, disseminate, present, exhibit or advertise, or to offer to do the same.” (Penal Law § 263.00 [5].)

. The harm to children exploited in the production of pornography has many facets. In addition to the direct occasionally physical and always emotional and mental abuse inherent in the original production, the publication of this permanent record of the child’s humiliation serves as a constant reminder, and a continuing source of recurrent embarrassment and emotional trauma. Children so exploited are frequently emotionally and sexually dysfunctional in adult life and often become child abusers themselves. (New York v Ferber, 458 US 747, 758, n 9, 759, n 10 [1982]; see also, Osborne v Ohio, 495 US 103, 111 [wherein it was further noted that child pornography is often used, as in this case, by pedophiles to seduce other children].)

. The Court did, however, expressly restrict its finding to visual depictions noting that other, nonobscene descriptions or depictions would continue to enjoy First Amendment protection (New York v Ferber, supra, at 764-765). Ferber therefore supports the conclusion that the text of Internet communications, even if arguably child pornography, is protected under the First Amendment.